JAGENBERG, INC. and Allianz
Versicherungs A.G.,
Plaintiffs,

v.

GEORGIA PORTS AUTHORITY
and Atlantic Container Line
A.B., Defendants.

Civ. A. No. 494–113.

United States District Court,
S.D. Georgia,
Savannah Division.

March 28, 1995.

Richard A. Rominger, Thomas Langston Bass, Jr., Brennan, Harris & Rominger, Savannah, GA, Machale A. Miller, O'Neil, Eichin, Miller, Breckinridge & Saporito, New Orleans, LA, for Jagenberg, Inc. and Allianz Versicherungs, A.G.

Glen M. Darbyshire, Hunter, Maclean, Exley & Dunn, Thomas J. Mahoney, Jr., Thomas Joseph Mahoney, III, Ranitz, Mahoney, Forbes & Coolidge, P.C., Savannah, GA, for Georgia Ports Authority.

Gustave R. Dubus, III, Chamlee, Dubus & Sipple, Savannah, GA, for Atlantic Container Line A.B.

## ORDER

EDENFIELD, Chief Judge.

Plaintiffs seek to recover damages for loss of cargo consisting of components from an industrial Airknife machine, unloaded and stored by Defendants at the Port of Savannah in May, 1993. Both Defendants now move for partial summary judgment. For reasons stated below the Court **DENIES** the motion of Defendant Georgia Ports Authority ("GPA") and **GRANTS** the motion of Defendant Atlantic Container Line ("ACL").

### I. JURISDICTION

The Court exercises jurisdiction over this case under 28 U.S.C. § 1332, and makes no

finding as to whether jurisdiction would be proper in admiralty, under 28 U.S.C. § 1333. At first glance it appears that admiralty jurisdiction would be inappropriate, but courts have so held under circumstances similar to those in the case at bar. *E.g., Certain Underwriters of Lloyds' v. Barber Blue Sea Line,* 675 F.2d 266, 268 n. 1 (11th Cir.1982); *Orient Overseas Line v. Globemaster Baltimore, Inc.,* 33 Md.App. 372, 365 A.2d 325, 335 (1976). *See also Puerto Rico Maritime Shipping Authority v. Luallipam, Inc.,* 631 F.Supp. 1472 (D.P.R.1986) ("A contract to transport goods by sea concerns commerce on navigable waters and, as such, is wholly maritime."); R. Randall Bridwell, *Admiralty Contract Jurisdiction & Contract Liens Under American Law, in* **Southeastern Admiralty Law Institute Program Materials** 06–1, 06–5 (1988) (listing maritime contracts as within admiralty jurisdiction). Such a holding makes sense; "commerce and uniformity go together," *In re Dillahey,* 733 F.Supp. 874, 879 (D.N.J.1990) (citation omitted), and carriers of maritime cargo would benefit from uniform rules of liability for their agents and independent contractors at all United States ports, regardless of the state in which those ports are found. *Cf. Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745, 747 (4th Cir.1975) (stating that during the Constitutional Convention "[t]hirteen separate bodies of law were thought quite unacceptable for the governance of international trade").

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." All evidence must be considered "in the light most favorable to the nonmoving party," with all reasonable doubts resolved in favor of that party. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). If the evidence favoring the nonmoving party is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct.

2505, 2510–11, 91 L.Ed.2d 202 (1986) (subsequent history omitted). A mere "scintilla" of evidence will not suffice to support the nonmovant's position. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

## III. GEORGIA PORTS AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

### A. Facts

The material facts relevant to this motion are not disputed. The parties' disagreement centers on the legal interrelationships between the carrier's bill of lading, the Carriage of Goods by Sea Act ("COGSA"), and the Harter Act.

The essential facts are as follows:

Jagenberg, Inc., is a Delaware corporation having its principal place of business in Connecticut. It is the consignee and agent for Jagenberg AG, the shipper of the cargo in question. Jagenberg, Inc., is bound by all contract terms of carriage set by Jagenberg AG as shipper. They will henceforth be collectively referred to as "Jagenberg." Allianz Versicherungs AG is a foreign corporation and the insurer of the cargo.

Atlantic Container Line operated the vessel transporting the cargo from Rotterdam, The Netherlands, to the Port of Savannah for ultimate delivery to Macon, Georgia. Georgia Ports Authority is an agency of the State of Georgia that owns and operates ocean terminal facilities in Savannah. In this case GPA acted under agreement with ACL with respect to handling and storage of cargo at the Port of Savannah. It is not disputed that GPA was an agent of ACL. *See also* GPA Tariff at 51.

Jagenberg formed a contract with ACL for shipment of an Airknife Coating Head from Rotterdam to Macon via Savannah, the terms of which are contained in a short form bill of lading issued by ACL entitled "ACL Datafreight Receipt" and a long form bill of lading printed on the reverse side of the Receipt. The bill of lading was a "through bill," i.e., it obligated the carrier to transport the cargo "through" the Port of Savannah to its ultimate destination.

The cargo shipment consisted of twenty five packages, twenty two of which were packed in containerized units. The remaining three were crated separately, one of which contained the cargo at issue here—a large component of the Airknife Coating Head. It was completely enclosed within a wooden crate and lashed to a metal flatrack. The flatrack was designed to sit upon and attach to a chassis that could be pulled by a conventional tractor, thus enabling ground transportation of the cargo.

The cargo arrived in Savannah on May 15, 1993, and was turned over to GPA for storage pending arrival of an inland trucker hired by ACL to take it to Macon. By May 20, 1993, all of the containerized units and some of the crates had been trucked to Macon, but while a GPA employee was retrieving the remaining items from a storage area designated for ACL cargo, the items fell from the chassis and were damaged. Jagenberg and Allianz brought suit against GPA and ACL, arguing that the Defendants breached their obligations as bailees of the cargo and negligently damaged it in the amount of $750,000.

It is also undisputed that the Datafreight Receipt contained a specific space for Jagenberg to describe the goods and declare their value in U.S. dollars "subject to extra freight as per tariff and clause six of the ACL B/L." Jagenberg chose not to declare a specific value for its shipment, but had sufficient notice and opportunity to do so. Finally, neither party disputes that the damaged item in question constituted a single "package" for purposes of COGSA, 46 U.S.C.App. § 1304(5), and clause six of the ACL bill of lading.

### B. Law

#### 1. GPA's Argument

GPA asks for partial summary judgment not on liability, but on damages. GPA contends that it is protected by the $500 package liability limitation provided in COGSA. 46 U.S.C.App. § 1304(5). While that limitation is "clearly designed to protect the shipping industry," *Heri v. Fritz Companies, Inc.*, 841 F.Supp. 1188, 1191 (N.D.Ga.1993), it is often contractually extended to activities prior to loading and after discharge and to parties that technically are not carriers but act as agents or contractors for them.

The COGSA limitation is incorporated in clause six of the ACL bill of lading. That clause provides

6. PACKAGE/UNIT LIMITATION AND DECLARED VALUE

(1) Package or Unit Limitation

Where the Hague Rules or any legislation making such Rules compulsorily applicable (such as COGSA or COGWA) to this Bill of Lading apply, the Carrier shall not, unless a declared value has been noted ... be or become liable for any loss or damage to or in connection with the goods in an amount per package or unit in excess of the package or unit limitation as laid down by such Rules or legislation. Such limitation amount according to ... COGSA is US$500[.]

GPA argues that for purposes of the bill of lading, it was a "Carrier": "In this Bill of Lading the word "Carrier" includes Atlantic Container Line AB, the vessel, owner, master and any charterer, pre-carrier, on-carrier *and any other person participating in the carriage of the goods.*" Bill of Lading cl. 1 (emphasis added). Clause five of the bill is a "Himalaya clause," extending the privileges of the "Carrier" to other entities:

5. CERTAIN RIGHTS AND IMMUNITIES FOR THE CARRIER AND OTHER PERSONS

(1) The Carrier shall be entitled to subcontract on any terms the whole or any part of the carriage.

(2) *The Merchant [Jagenberg] undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier including, but not limited, to the Carrier's servants or agents, any independent contractor and his servants or agents, and all others by whom the whole or any part of the carriage, whether directly or indirectly, is procured, performed or undertaken,* which imposes or attempts to impose upon any such person or vessel any liability whatsoever in connection with the goods or the carriage, and if any claim or allegation

should nevertheless be made to defend, indemnify and hold harmless the Carrier against all consequences thereof. *Without prejudice to the foregoing every such person and vessel shall have the benefit of all provisions herein benefiting the Carrier as if such provisions were expressly for his benefit* and in entering into this contract the Carrier, to the extent of these provisions, does so not only on his own behalf but also as agent or trustee for such persons and vessels and such persons and vessels shall to this extent be or be deemed to be parties to this contract.

(3) The Merchant shall defend, indemnify and hold harmless the Carrier against any claim or liability (and any expense arising therefrom) arising from the carriage of goods insofar as such claim or liability exceeds the Carrier's liability under this Bill of Lading.

(4) The defences [sic] and limits of liability provided for in this Bill of Lading shall apply in any action against the Carrier whether the action be found in contract or in Tort. (Emphasis added.)

GPA says that either as an "agent" of ACL or as a "Carrier" itself (pursuant to clause one of the bill of lading), this Himalaya clause extends to it the benefit of all contractual provisions—including the package limitation—that benefit the Carrier.

Finally, GPA argues that clause three of the bill of lading, a "clause paramount," contractually extends the package limitation beyond discharge.

3. CARRIER'S RESPONSIBILITY

(1)(A).... If and to the extent that the provisions of the Harter Act of the United States of America 1893 would otherwise be compulsorily applicable to regulate the Carrier's responsibility for the goods during any period prior to loading on or after discharge from the vessel the Carrier's responsibility shall instead be subject to COGSA....

 Though sharply curtailed by the enactment of COGSA, see 46 U.S.C.App.

§ 1311, the Harter Act, 46 U.S.C.App. § 190 et seq., still governs a shipment prior to loading and after discharge, until "proper delivery" is made to the consignee or its agent. *See id.* § 190. This is so because COGSA, by its terms, only applies from the time goods are loaded onto a vessel to the time they are discharged at a port. *See* 46 U.S.C.App. § 1301(a). While the details of Harter are not relevant here, the clause paramount has contractually tied COGSA protection to the statutory limit of Harter,[1] and so the Carrier enjoys the COGSA package limitation until it has made a "proper delivery" to the consignee under the Harter Act. GPA contends that the damage to the Airknife component occurred before "proper delivery" to Jagenberg, and since GPA is due the protections given a Carrier under the agreement, it cannot be liable for more than $500 of damage to the machinery.

The Court now turns to Jagenberg's arguments against extending liability protection to GPA. Although the Court's decision regarding GPA's motion rests on its reading of the Himalaya clause contained in the bill of lading, other arguments are addressed because they impact upon ACL's motion for summary judgment, discussed *infra*, part IV.

### 2. Jagenberg's Arguments

a. There Is No Admiralty Jurisdiction, So Maritime Laws Do Not Apply

Jagenberg argues that because the contract between the parties was intermodal, involving transport over land as well as sea, the sea and land segments are discrete and subject to different legal treatment: Sea carriage, subject to admiralty jurisdiction, requires application of federal maritime laws, and inland transit, outside admiralty jurisdiction but within diversity jurisdiction, requires application of state laws. Jagenberg claims that because the incident in question occurred during the inland transit phase, maritime laws, including liability limitations under maritime statutes, cannot apply.

*M/V Peisander,* 648 F.2d 415, 420 (5th Cir.1981); *Baker Oil Tools, Inc. v. Delta Steamship Lines,* 562 F.2d 938, 940 n. 3 (5th Cir.1977), *reh'g denied,* 571 F.2d 978 (5th Cir.1978).

---

**1.** The parties may contractually extend the COGSA package limitation to cover the entire time in which the carrier has custody of the cargo. *See* 46 U.S.C.App. § 1307; *Brown & Root, Inc. v.*

In support of this view Jagenberg first quotes **Benedict on Admiralty** § 183, at 9–10 (7th ed. 1994) (emphasis added):

> Contracts that contain maritime and nonmaritime obligations present a special problem. It is said that a contract will not be within the admiralty jurisdiction unless it is wholly maritime. But there are two exceptions to this rule. First, if the non-maritime element is incidental and not separable, maritime jurisdiction will encompass the entire claim. Second, *if the non-maritime element is separable from the maritime element so that is may be litigated separately without prejudice to either party, there is admiralty jurisdiction over [only] the maritime element.*

Having established that this case, which occurred on land, does not fall within the Court's admiralty jurisdiction, Jagenberg then quotes *Harville v. Johns–Manville Products Corp.*, 731 F.2d 775, 787 (11th Cir. 1984), for the proposition that "[b]ecause the plaintiff's claims are not cognizable under federal maritime jurisdiction, there is no justification for supplanting state tort law with the substantive law of admiralty."

*Harville*, however, did not involve carriage of goods, but dock workers claiming damages for asbestos exposure. As such, there was no seafaring element to the case and, importantly, maritime laws like COGSA and Harter were not relevant. It was a personal injury action were the injuries happened to occur on a dock. Other cases cited by Jagenberg also did not involve cargo transport contracts, and so are equally inapplicable. *See Laredo Offshore Constructors v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir.1985) (breach of contract involving construction of stationary offshore oil drilling platform); *In re Dearborn Marine Service, Inc.*, 499 F.2d 263 (5th Cir.1974), *cert. denied*, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975) (tort actions arising from offshore oil drilling platform explosion).

▄ Admittedly, in the instant case there was simply damage to property "that happened to occur on a dock," but that damage occurred in the context of fulfilling a contract for the delivery of goods. COGSA and the Harter Act were thus implicated, and

these bodies of law pre-empt state law wherever they are applicable. A lengthy analysis of this point was presented by the court in *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 740 (4th Cir.1993); it arrived at this conclusion:

> So long as the bill of lading is still governed by COGSA or the Harter Act, which includes the period of time after discharge of the goods but prior to delivery, the rights and obligations of third party beneficiaries under a Himalaya clause should be determined with reference to the bill of lading, not state law, even if state law is inconsistent.

Thus, if there has not yet been a "proper delivery" under the Harter Act, state law does not apply, *regardless of whether jurisdiction is in admiralty or in diversity.* The Eleventh Circuit's reasoning in *Harville, supra*, that jurisdiction directly begets the appropriate substantive law, is irrelevant in the context of maritime contracts.

Other Eleventh Circuit cases, involving the liability of carriers and their agents for damage to goods, recognize this point. In *Hiram Walker & Sons v. Kirk Line*, 877 F.2d 1508 (11th Cir.1989), *cert. denied*, —— U.S. ——, 115 S.Ct. 1362, 131 L.Ed.2d 219 (1995), the owner sued the carrier and stevedore for damage to his cargo occurring two days after discharge but during storage at the terminal. The court explicitly held that the claim against the stevedore was brought under diversity jurisdiction, *id.* at 1511–12, but readily found that the stevedore, an independent contractor, would be protected by a contractual COGSA package limitation if certain factual disputes were resolved in its favor. *Id.* at 1516–17. In *Assicurazioni Generali v. D'Amico*, 766 F.2d 485 (11th Cir.1985), the insurer of a consignee brought suit against the carrier and stevedore for cargo damage occurring during storage at the terminal eighteen days after discharge from the vessel. The court found no error in the fact that the insurer had sued in admiralty under 28 U.S.C. § 1333, *id.* at 487, and held that the terminal operator was protected by a contractual COGSA limitation in the bill of lading. *Id.* at 489–90. Finally, in *Certain Underwriters at Lloyds' v. Barber Blue Sea*

*Line,* 675 F.2d 266 (11th Cir.1982), the insurer of a consignee sued a carrier and stevedore for loss of cargo occurring during storage "within ten days" of discharge. The district court had asserted admiralty jurisdiction over the claims and recognized diversity jurisdiction "in the alternative," *id.* at 268 n. 1; the circuit found no error in the district court analysis and affirmed its finding that the terminal operator was protected by a contractual COGSA package limitation. *Id.* at 270. *See also Mori Seiki USA, Inc. v. M.V. Alligator Triumph,* 990 F.2d 444 (9th Cir.1993); *Samincorp, Inc. v. S/S Mormacargo,* 1983 A.M.C. 293 (S.D.N.Y.).

■ Jagenberg repeatedly insists that the Harter Act, being a maritime law, has nothing to do with inland transit and so no contractual package limitation was in force when the machinery was damaged. But Jagenberg itself then admits that the inland transit element does not begin until "proper delivery" is made under the Harter Act. *See, e.g.,* Jagenberg. First Mem. in Opp. ¶ 14. This second point is the crucial one in this analysis: in disputes over limitations of liability for cargo damage, whether or not the contract is "mixed" is an issue *conceptually distinct* from that of whether the Harter Act governs. As explained above, ACL's bill of lading contractually extends the COGSA liability limitation to the extent that the Harter Act statutorily applies, and the Harter Act statutorily applies until the carrier has made a "proper delivery" to the consignee. If proper delivery was made before the incident, there is no package limitation; if it was made afterward, there is a package limitation, regardless of how the contract is characterized or how the Court finds jurisdiction.[2]

b. The Bill of Lading Limits The COGSA Package Limitation To Where COGSA Applies By Law, So It Does Not Extend Post–Discharge

Jagenberg argues that while clause three of the bill of lading (the clause paramount) generally extends COGSA to the period following discharge, clause six, dealing specifically with the COGSA package limitation, makes the limitation applicable only in instances where COGSA "compulsorily" applies. Consequently, this argument goes, because clause six is a more specific clause that clause three, clause six controls, e.g., *Holtzclaw v. City of Dalton,* 189 Ga.App. 650, 652, 377 S.E.2d 196 (1988) (noting general canon that if contract provisions appear to conflict, a limited or specific provision prevails over a broad one), and while by clause three COGSA generally extends beyond discharge, the COGSA package limitation does not, and so GPA's conduct is not covered by it.

The argument would work if clause three and clause six did indeed conflict, but they do not. The Court agrees with Jagenberg that the ACL bill of lading is a rather sorry grammatical specimen, but careful reading reveals clause six does not contradict clause three. The vital sentence is this:

Where the Hague Rules or any legislation making such Rules compulsorily applicable (such as COGSA or COGWA) to this Bill of Lading apply, [the Carrier shall not be liable for loss or damages beyond $500].

The confusion generated by clause six springs from two sources. It is caused first by the convoluted reference made to relevant maritime laws. "[L]egislation making [the Hague] Rules compulsorily applicable (such as COGSA or COGWA) to this Bill of Lading" means in this case, simply, "COGSA." Confusion is next caused by the absence of a subject after the word "apply" and before the comma. If one were provided, it would be clear that the term "compulsorily applicable" modifies only "this Bill of Lading," and that the word "apply" modifies something else entirely, namely, the particular region, waters, port, situation, etc., in which the Carrier finds itself.

Clarified, clause six says essentially this: Where [COGSA] applies [to the situation at hand], [the Carrier shall not be liable for loss or damages beyond $500].

Jagenberg's argument is premised upon reading the clause as saying that where COGSA *compulsorily* applies to the situation

---

**2.** The issue of whether proper delivery occurred prior to the alleged damage is discussed *infra,* part IV.A.

at hand, the Carrier's liability shall not exceed $500. If it did say that, Jagenberg's argument would be correct, because after discharge COGSA can only apply by contract, not by law, and so application is not "compulsory," and no package limitation could apply. But after the Court's elucidation above, it is clear that the clause says nothing of the kind. The word "compulsorily" in clause six modifies only "this Bill of Lading," and not situations in which the Carrier might find itself. That is, the word is meant to discern between those laws that compulsorily apply to bills of lading and those that do not, not between laws that compulsorily apply to the situations in which the Carrier finds itself and those that do not.

The bill of lading defines maritime laws in such a broad and convoluted manner in order to cover the wide range of domestic and foreign jurisdictions in which the bill is used. If it refers to the Hague Rules and then to any laws directly—"compulsorily"—incorporating Hague Rules, such as COGSA,[3] it will be sure to account for varying legal regimes worldwide. That is all the significance the word "compulsorily" is meant to have.

Returning to clause three, it now fits nicely with clause six. Clause three makes COGSA "applicable" to the extent the Harter Act is "compulsorily applicable," i.e., until proper delivery. Clause six states that the Carrier enjoys the package limitation wherever COGSA "appl[ies]," and now clause three points out that COGSA is "applicable" to the extent of Harter. In reality, it is clause three that provides a specific modification of clause six, and not the reverse, as Jagenberg contends.[4]

### c. GPA Is Not A "Carrier," So It Is Not Protected By A COGSA Liability Limitation

#### Part One

Jagenberg argues that GPA should not benefit from the package limitation because it is not a "Carrier" under the bill of lading. It bases this argument on clause one of the bill, which states:

> In this Bill of Lading the word "Carrier" includes Atlantic Container Line AB, the vessel, owner-master and any charter, pre-carrier, on-carrier and any other person participating in the carriage of goods.

Jagenberg invokes the venerable *ejusdem generis*[5] rule of construction to argue that the set of persons included in the term "any other person" is limited by the specific enumeration of other kinds of persons before it. Thus GPA is not included, because while the list specifically enumerates entities that actually physically move cargo from one place to another, it does not include "support companies"—like stevedores and terminal operators—that merely assist them. Jagenberg further contends that the clause is ambiguous and "does not contain the requisite specificity and clarity to include the GPA." Jagenberg cites *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959) (clauses limiting liability of carriers or their agents or contractors must be "strictly construed and limited to intended beneficiaries"), *Assicurazioni Generali v. D'Amico*, 766 F.2d 485, 488 (11th Cir.1985) (citing *Herd* for that proposition), and *Philip Morris v. American Shipping Co., Inc.*, 748 F.2d 563, 566 (1984), *reh'g denied*, 753 F.2d 1087 (11th Cir.1985) (stipulations limiting carriers' liability under the Harter Act will be strictly construed), in support.

■ It is true that any intention to expand legal protections to entities besides the carrier must be clearly expressed in the terms of the contract. But clause one does not address legal protections, and so does not require the specificity of clauses expanding

---

3. *See* **Gilmore & Black, The Law of Admiralty** 144 (2d ed. 1975) (COGSA "with minor differences follows verbatim the Hague Rules").

4. It also appears to the Court that clause six was merely intended to satisfy the "notice and fair opportunity" requirement that is a precondition to a valid package limitation defense, and not to further limit the reach of COGSA limitations. *See Ins. Co. v. M/V Ocean Lynx*, 901 F.2d 934,

939 (11th Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991). There is otherwise no reason to repeat that which is stated in the COGSA itself, and follow it with a paragraph on the declared value of packages or units.

5. The direct translation is "of the same kind or class."

liability limitations "in derogation of common law rights." Jagenberg First Mem. in Opp. at 22. Even holding the clause to that standard, however, the Court finds the definition of "Carrier" sufficient to include the GPA. In the Eleventh Circuit,

> the 'clarity of language' requirement [for Himalaya clauses] does not mean [that legal protections] extend only to parties specifically enumerated in the bill of lading. It is sufficient that the terms express a clear intent to extend benefits to a well-defined class of readily identifiable persons.

*Certain Underwriters,* 675 F.2d at 270 (quoting *Herd,* 359 U.S. at 305, 79 S.Ct. at 771). Clause one is not as much ambiguous as it is broad. The set of "any persons participating in the carriage of goods" is fairly easily defined, if potentially large. The clause does not specifically enumerate stevedores and terminal operators, but it is sufficiently "well-defined" to show ACL's intent to include them in the definition. Such parties clearly "participate in the carriage of goods"; every carrier performing on every bill of lading makes use of stevedores and terminal operators at every port of discharge. It was clear to those who drafted the definition that these entities could be included therein. *See also Wemhoener,* 5 F.3d at 737 (finding no insurmountable ambiguity in the phrase "any person whomsoever by whom the Carriage or any part of the Carriage is performed or undertaken"). *Cf. Leather's Best Inc. v. S.S. Mormaclynx,* 313 F.Supp. 1373, 1382–83 (E.D.N.Y.1970), *aff'd in part, rev'd in part,* 451 F.2d 800 (2d Cir.1971) (describing terminal operators as an "instrumentality for performing the carrier's duty").

In *Underwriters,* the bill of lading also contained a clause defining "Carrier." It was marginally more specific than that in the instant case. It stated: "In the bill of lading the word "Carrier" includes the shipowner, and any of its employees, agents, or contractors." 675 F.2d at 268 n. 3. The Eleventh Circuit, however, found that clause irrelevant to deciding if a terminal operator could take advantage of a contractual COGSA limitation. It looked only to the Himalaya clause included later in the bill, and decided the case purely on the language of that provision. This Court finds the definition of "Carrier" in clause one of ACL's bill of lading equally unimportant, and turns now to the Himalaya clause that is clause five of the bill.

### Part Two

Subsection two of clause five reads as follows:

> (2) The Merchant undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier including, but not limited, to the Carrier's servants or agents, any independent contractor and his servants or agents, and all others by whom the whole or any part of the carriage, whether directly or indirectly, is procured, performed or undertaken, which imposes or attempts to impose upon any such person or vessel any liability whatsoever in connection with the goods or the carriage, and if any claim or allegation should nevertheless be made to defend, indemnify and hold harmless the Carrier against all consequences thereof. Without prejudice to the foregoing every such person and vessel shall have the benefit of all provisions herein benefiting the Carrier as if such provisions were expressly for his benefit and in entering into this contract the Carrier, to the extent of these provisions, does so not only on his own behalf but also as agent or trustee for such persons and vessels and such persons and vessels shall to this extent be or be deemed to be parties to this contract.

As Jagenberg notes, it is not a triumph of lucidity. Jagenberg argues that this clause, by its terms, does not include GPA in the list of those to whom are extended the legal defenses of the Carrier, and that even if it could be read to include GPA, it is ambiguous and should be construed against the terminal operator.

Specifically, Jagenberg observes that there is no comma after the word "Carrier" in the first sentence, signifying that the word "including" modifies the word "Carrier," and not the preceding phrase "any person or vessel whatsoever." Thus, the first sentence says that the Merchant (Jagenberg) cannot sue any "person or vessel" besides the Carrier, and "Carrier" includes entities like

"agents" and "independent contractors," GPA being one of them. The second sentence says that those persons and vessels besides the Carrier will "have the benefit of all provisions herein benefiting the Carrier as if such provisions were expressly for his benefit." (Those "provisions" include the COGSA package limitation provision in clause six and, by extension, clause three.) Thus, says Jagenberg, because the GPA is not included among those "persons and vessels" that benefit, it is not protected by the package limitation.

Jagenberg is exactly right. As written, the word "including" modifies "Carrier," and not the preceding phrase. The Court is sure on this point for two reasons: (1) it is simply the correct grammatical reading of the sentence, and (2) the ACL bill as a whole shows that its drafters were clearly not reluctant to use commas, so there is no good reason to infer the presence of one here. The GPA is not included, by the clause as written, in that group of persons or vessels to whom are extended the Carrier's legal protections.

The word "including" obviously must modify either the term "persons or vessels" or the word "Carrier," and we have just settled upon the latter. It thus could be argued that the very word "Carrier" in the Himalaya clause, in keeping with clause one, includes entities like the GPA. Subsection three of clause five reads:

> The Merchant shall defend, indemnify and hold harmless the Carrier against any claim or liability (and any expense arising therefrom) arising from the carriage of goods insofar as such claim or liability exceeds the Carrier's liability under this Bill of Lading.

It states that the Merchant will "hold harmless" the Carrier for any liability beyond that provided by the bill of lading, i.e., the package limitation provision. So it could be said

that because the definition of "Carrier" includes the GPA, this provision, if not the Himalaya clause directly above it, contractually grants the ACL's liability protection to the GPA.

■ It must be kept in mind, however, that clauses extending limitations on liability are always strictly construed. *Robert C. Herd,* 359 U.S. at 305, 79 S.Ct. at 771 ("Himalaya clauses must be strictly construed and limited to intended beneficiaries"); *Generali,* 766 F.2d at 488 (citing *Herd* ); *Philip Morris,* 748 F.2d at 566. *See also Institute of London Underwriters v. Sea–Land Service, Inc.,* 881 F.2d 761, 767 (9th Cir.1989). The intent to extend liability limitations to persons besides the carrier must be unequivocally expressed. While the specificity of language required by this Circuit is not as rigorous as that required by some others, to grant liability protection to GPA on the basis of the argument above would be an unprecedented loosening of standards in this area. The most general of Himalaya clauses held to extend liability protection to terminal operators at least mention "agents" or "independent contractors" among those protected. *See, e.g., Underwriters,* 675 F.2d at 270. Here, subsections two and three operate, as written, to affirmatively *remove* agents, servants and independent contractors from the protections given the carrier. The GPA cannot be imported into the set of persons protected by the clause by inference from clause one of the bill to clause five, to clause six, or by reference to any other kind of interpretive gymnastics.

■ It could be that ACL did intend to extend protection to its agent GPA,[6] but the plain language of the Himalaya clause does not support it.[7] Added to this are the strong policy reasons motivating strict construction of the clause against those who drafted it [8]— it attempts to limit the common law rights of

---

6. *Compare* Richard W. Palmer & Frank P. DeGiulio, *Terminal Operations & Multimodal Carriage: History & Prognosis,* 64 **Tul.L.Rev.** 281, 346 (1989) (presenting textbook example of Himalaya clause that extends protections to "servant[s], agent[s] and sub-contractor[s]") *with* ACL Bill of Lading cl. 5(2) (referring to the Carrier's "servants or agents, any independent contractor and his servants or agents, and all others").

7. In its briefs on this issue, the GPA never addresses the lack of a comma after the word "including" in the first sentence of the Himalaya clause.

8. GPA obviously did not draft the bill of lading, but it acted as an agent of the actual carrier that did and seeks its legal protections. Sound policy requires subjecting potential liability limitations

others, and the entire contract is one of "adhesion," created by ACL and presented to potential customers. When interpreting the tiny print of a long form bill of lading on the back of a short form bill, the Court is not inclined to interpret liberally. *See Allstate Ins. Co. v. Int'l Shipping Corp.*, 703 F.2d 497, 500 (11th Cir.1983) ("[W]e are reluctant to give effect to limiting clauses with which 'a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms.'") (quoting *Calmaquip Engineering Corp. v. West Coast Carriers Ltd.*, 650 F.2d 633, 639–40 (5th Cir.1981),[9] in turn citing *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 14 (2d Cir.1969)).

■ As Jagenberg notes, drafting a clear Himalaya clause "is not a demanding task," and this one is particularly poorly done. The deficiency is all the more inexcusable because lucid examples, ripe for copying by drafters, abound in the caselaw. *Compare Underwriters*, 675 F.2d at 268 n. 3 (involving more lucid Himalaya clause); *Wemhoener*, 5 F.3d at 737 (same).[10] The ACL clause is at the minimum ambiguous, and basic principles of maritime and common law governing interpretation of such provisions requires the Court to construe it against the GPA.[11]

The GPA's motion for partial summary judgment is denied.

## IV. ATLANTIC CONTAINER LINES' MOTION FOR SUMMARY JUDGMENT

In its motion, ACL also claims the protection of the COGSA package limitation. Here, because ACL is the actual carrier, the

Court need not address the Himalaya clause. Further, the Court has already determined, in part III.B.2.b *supra*, that the bill of lading contractually extends the package limitation to the statutory extent of the Harter Act. Finally, the facts relevant to this motion are the same as those provided in part III.A above, and there are no new disputes. Thus, all that is left to the Court is to decide if the incident occurred before "proper delivery" to Jagenberg. If so, ACL is protected by the package limitation, and its liability cannot exceed $500. If not, as Jagenberg contends, then ACL's liability is not limited to $500.

### A. Did "Proper Delivery" Occurr Before The Cargo Damage?

■ The Harter Act does not define "proper delivery," but the maritime caselaw provides guidance. *Isthmian Steamship Co. v. California Spray–Chem. Corp.*, 290 F.2d 486, 488–90 (9th Cir.1961), *modified*, 300 F.2d 41 (9th Cir.1962) (discussing and affirming district court definition of "proper delivery" as delivery that is sufficient by common law). Proper delivery may be either actual or constructive. *Orient Overseas Line*, 365 A.2d at 335.

*Actual delivery* consists in completely transferring the possession and control of the goods from the vessel to the consignee or his agent. *Constructive delivery* occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods to put them under proper care and custody.

---

of a carrier's agent to the same scrutiny and standards as limitations for the carrier itself.

**9.** Decisions of the former Fifth Circuit rendered before October 1, 1981, unless later overruled by the Eleventh Circuit, are binding precedent in this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

**10.** As GPA points out, the Himalaya clause language in *Wemhoener* is indeed similar to that in ACL's bill of lading, and this similarity makes the former clause instructive here. In *Wemhoener*, the clause stated that the merchant would bring

no claims against any person besides the carrier. The clause excepting the carrier was set apart by parentheses, thus leaving no doubt as to who was and was not protected. No such punctuation was used by ACL—neither parentheses nor a comma or other device.

**11.** GPA had much better luck in *Hoechst Celanese Corp. v. M/V Trident Amber*, 1992 A.M.C. 2769, 1992 WL 179219 (S.D.Ga.), which concerned a far clearer Himalaya clause and in which this Court found GPA covered by the package limitation.

*Id.* (emphasis added); *B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 F.2d 1305, 1308 (4th Cir.1983) (quoting *Orient Line* ); *Wemhoener,* 5 F.3d at 741–42 (quoting *B. Elliott* ). Upon proper delivery the Harter Act ceases to govern and the carrier's responsibilities are those of a bailee or warehouseman. *Orient Line,* 365 A.2d at 335.

Jagenberg argues that constructive delivery occurred before the incident, observing that the goods (a) had already been discharged from the vessel onto a fit wharf, (b) that the consignee had been notified of the shipment's arrival on May 17, 1993, Aff. of Harald Bordewieck ¶ 2 (and attachments), (c) that ACL's inland trucker had five days (a "reasonable opportunity," says Jagenberg) to remove the goods from the port, and (d) that most of the goods had already been shipped to their ultimate destination in Macon.

Though these facts are not disputed, the matter is not quite as simple as Jagenberg presents; there are several factors making the analysis more difficult: First, the contract was intermodal, meaning that ACL contracted with Jagenberg to transport the goods over sea from The Netherlands, and then over land to National Industrial Construction Co. in Macon, Georgia, to whom Jagenberg had resold the Airknife components. Macon was the place at which a consignee or its "agent" (here National Industrial) first encountered the cargo. Consequently, the Court must either extend the reach of the Harter Act—a maritime law—to the point of delivery in Macon, Georgia, or it must find some principled manner of deciding when a proper delivery occurred beforehand, despite the fact that, technically, no agent of Jagenberg had a reasonable opportunity to take the goods into "proper care and custody" before they reached Macon. If the inland trucker had been an agent of Jagenberg instead of ACL, the Court would find that proper delivery constituted loading the trucks, and would then find that proper delivery had not yet occurred in the instant case.[12] *E.g., Samincorp, Inc. v. S/S Morma-cargo,* 1983 A.M.C. 293 (S.D.N.Y.) (where goods discharged at port but found missing when consignee's trucker arrived twelve days later, court finds that "neither actual nor constructive delivery of the cargo was ever made to plaintiff"). Third, the incident occurred after discharge and after the goods were stripped and stored, but it also occurred at the port itself before the goods could be loaded onto trucks for inland transit. The Court is confident that damage done during stripping of goods from a mafi is done before proper delivery, e.g., *Wemhoener,* 5 F.3d at 736, and that damage done after goods are loaded onto trucks occurs after proper delivery, but the current situation, alas, falls somewhere in between.

 The Court finds that at the moment the Airknife component was damaged proper delivery had not yet occurred. As stated, the Harter Act is at its core a maritime law; the Court is unwilling to rule that simply because private parties enter an intermodal agreement federal maritime legislation is thus extended far beyond its congressionally intended bounds.[13] The Harter Act is

---

**12.** It is important to note in this case not only that GPA—who did the stevedoring and terminal operations—was a paid agent of ACL, but that ACL could have requested another entity to perform those functions. *See* GPA Tariff at 34 (Reg. 34–230, allowing others to load, unload and handle cargo with special permission from GPA). Also, ACL did not lose control of the cargo once it was discharged; the "custom and usage" of the Port of Savannah did not dictate that GPA "usurp" ACL's control over the goods. ACL delegated that control to GPA.

The Court makes these observations because had ACL been required by local law to completely relinquish control of the cargo to state-employed stevedores upon discharge, then legally proper delivery probably would have occurred at that time. The sea carrier would have been blocked, by local law, from further guaranteeing the safety of the cargo, and courts find it unfair to continue to hold carriers liable in those situations. *See, e.g., TAPCO NIGERIA, LTD. v. M/V WESTWIND,* 702 F.2d 1252, 1257–58 (5th Cir. 1983) (finding proper delivery at point of discharge where, upon leaving the vessel, cargo fell under "absolute control" of Nigerian stevedores). *See generally Tan Hi v. United States,* 94 F.Supp. 432 (N.D.Cal.1950) (holding that the common law requirement of proper delivery is modified by the custom, regulations, or law of the port of destination).

**13.** In its briefs GPA cites two secondary sources for the proposition that the Harter Act applies to all stages of a "through" bill of lading, but neither commentator cites a case in support of the proposition. *See* Carter T. Gunn, *Update on Containerization: Multimodalism Revisited, in* **South-**

designed solely to regulate the liability of seagoing carriers. *See* 46 U.S.C.App. §§ 190–91; *Flint v. Christall*, 171 U.S. 187, 190–95, 18 S.Ct. 831, 832–34, 43 L.Ed. 130 (1898); **Gilmore & Black, The Law of Admiralty** 142 (2d ed. 1975). That said, the Court finds that the Harter Act *does* reach to the point at which goods are loaded onto the vehicles of an inland trucker, whether hired by the shipper or the carrier. *Cf. Philip Morris*, 748 F.2d at 566 ("[T]he Harter Act applies to those extended periods of time before and after the loading of the cargo on and off the vessel."); *Isthmian Steamship Co. v. California Spray–Chem. Corp.*, 300 F.2d 41, 46 (9th Cir.1962) (arguing that if Harter Act is limited to point of discharge it is made irrelevant by COGSA, which extends just as far and pre-empts Harter where the two overlap). It is at that point that the sea carrier has, admittedly in a more general sense than intended by Congress a hundred years ago, "delivered" the goods. *See Philip Morris*, 748 F.2d at 566 ("The district court properly found that delivery by [the sea carrier] to [the consignee] was not effected until the cargo was picked up by Central Truck Lines on January 21, 1980.").

■ Here, the goods were damaged at port and before loading onto trucks, and so no proper delivery occurred prior to the incident. Though Jagenberg argues otherwise, the Court does not find the five day period between discharge and damage particularly relevant. Past cases have found no proper delivery where goods were damaged at port well after discharge from a vessel. *See, e.g., Wemhoener*, 5 F.3d at 736 (damage six days after discharge); *Samincorp.*, 1983 A.M.C. at 294 (cargo loss twelve days after discharge). And though helpful, the identity of the inland carrier's principal is not dispositive, either. As stated, if Jagenberg had hired the trucker that received the cargo in Savannah, the analysis would be easier, but because the

Court will not stretch the Harter Act all the way to Macon, it changes little that the trucker was hired by ACL. It helps—since the trucker was an agent of ACL and not Jagenberg, the latter could never have had a "reasonable opportunity" to remove the goods. *See Orient Line*, 365 A.2d at 335. Either way, however, proper delivery by the sea carrier happened when cargo held at the port was loaded onto trucks, and not before. *See, e.g., Hiram Walker & Sons, Inc. v. Kirk Line*, 30 F.3d 1370, 1379 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1362, 131 L.Ed.2d 219 (1995) (Tjoflat, J., dissenting) (finding that "legal delivery took place, at the latest," when cargo was physically transferred from cargo containers to trucks).

■ *Wemhoener* is instructive on this point, as well. In that case the court held that "Wemhoener's cargo was not 'at the disposal' of the consignee and was not ready to be received by the inland carrier until *after* it had been stripped from POL's mafi." 5 F.3d at 742 (emphasis in original). This Court extends the Fourth Circuit's reasoning. Just as goods are not available to the inland carrier before the mafi is stripped by the terminal operator, nor are they available before they are physically moved out of storage by agents of the sea carrier and prepared for the trucker to be able to actually receive them. *See Hiram Walker*, 30 F.3d at 1379.

■ In this age of "containerized" cargoes subject to "multimodal" bills of lading, it is often difficult to locate precisely the points of legal delivery. Increasing efficiency and integration in cargo transport continues to blur the lines separating sea carrier responsibilities from those of others. The Court finds it advisable to keep sea carriers to the standards imposed by the Harter Act until goods are in the hands of land carriers and actually leaving the maritime arena. With COGSA covering carriers' legal respon-

eastern Admiralty Law Institute Program Materials 09–1, 09–20 (1988) (stating that "[i]n the case of shipment of goods pursuant to a through bill of lading ... delivery occurs at the cargo's ultimate destination, rather than at the dock," but citing no case in support); Richard W. Palmer & Frank P. DeGiulio, *Terminal Operations & Multimodal Carriage: History & Prognosis*, 64 **Tul.L.Rev.** 281, 346

(1989) (stating that "[i]f the goods are moving under a through bill, delivery does not occur until the cargo reaches its destination" and citing Gunn in support).

ACL does not bother to argue the particulars of Harter Act deliveries in its own brief, apparently content to rely on the Court's reading of GPA's submissions.

sibilities through discharge, Harter fills a potential gap between discharge and inland transit in those situations where goods, though on the dock, are still within the control and responsibility of the sea carrier.

ACL's motion for partial summary judgment is granted.

## V. CONCLUSION

Because liability protection is not clearly and expressly extended to Defendant GPA in the bill of lading, its motion for partial summary judgment is **DENIED.** Because damage to the Airknife component occurred prior to proper delivery under the Harter Act, at the time of the incident ACL still enjoyed the protection of the COGSA liability limitation contractually extended to the statutory limits of Harter by the bill of lading. Thus, ACL's motion for partial summary judgment is **GRANTED.**