**REVISED, March 12, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-30143

_____


SERVICIOS-EXPOARMA, C.A.,
and
ORIMPEX-ZONA IND. DEL ESTE,

Plaintiffs-Appellees,

VERSUS

INDUSTRIAL MARITIME CARRIERS, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
February 25, 1998


Before MAGILL,[*] SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


In this maritime case, we are called upon to decide two issues under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300-1315 (1994). We must first determine when "delivery" occurs under 46 U.S.C. app. § 1303(6), commencing the one-year period during which a shipper may bring an action for cargo damage against a carrier. We must also decide which party§§the carrier or

[*] Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

the shipperSSbears the burden of proving the extent of damage to each package for purposes of COGSA's $500 per-package limitation of liability, 46 U.S.C. app. § 1304(5). The district court concluded that "delivery" under § 1303(6) did not occur until the consignee had a reasonable opportunity to inspect the shipped goods, and that the carrier bore the burden of showing the extent of damage to each package. We reverse.

I.

In 1992, Orimpex-Zona Ind. del Este ("Orimpex"), a Venezuelan business, bought $1,360,001 worth of pre-fabricated steel building materials from Butler Manufacturing ("Butler"), of Kansas City. The materials were designed to fit into 40-foot cargo containers, and Butler recommended that the materials be shipped as such. Orimpex opted to ship the cargo uncontainerized, however, and Butler provided the materials in 1,140 packages, including plastic-bagged rolls of insulation; cartons of fasteners, roofing and wall materials; and bundles of structural steel.

Orimpex, through its Venezuelan customs broker, Servicios Expoarma, C.A. ("Servicios"), arranged for shipping and insurance for the building materials. Servicios contracted with Industrial Maritime Carriers, Inc. ("IMC"), to ship the goods from New Orleans to La Guaria, Venezuela, in two shipments.

The bill of lading specified that "[t]he Carrier or his Agent shall not be liable for loss of or damage to the goods during the period before loading and after discharge from the vessel howsoever

such loss or damage arises." It also specified that the carrier assumed responsibility for the goods "from ship's tackle at port of loading to end of ship's tackle at port of discharge . . . ." The nature and value of the two shipments were not declared beyond the $500 per package limit of liability contained in COGSA, 46 U.S.C. app. § 1304(5).

The first shipment, aboard the M/V ANDREALON, departed New Orleans on April 16, 1992. The second shipment, aboard the M/V ARDAL, left New Orleans on May 2, 1992. The bills of lading for both shipments showed Servicios as consignee and "notify" party and were issued without exceptions, clean on board.

The ANDREALON arrived in La Guaria and commenced out-turn on April 30, completing discharge on May 2. The goods were discharged to an adjacent pier under the ship's tackle, and then moved about 30 meters to the warehouse of Mercaduana Almacenes ("Mercaduana"), there to be stored pending customs clearance. The goods cleared customs on May 12 and then were released to the consignee.

The ARDAL arrived and began discharging its cargo to Mercaduana on May 14, completing discharge the same day. Servicios obtained customs clearance for the second shipment on May 25.

It was apparent upon out-turn that some of the goods from both shipments were damaged. Both parties conducted independent surveys of the damage and disagreed as to its cause and extent. After trial, the district court found that all the packages in the first shipment and half of the packages in the second had been damaged to some extent during transit.

3

Orimpex trucked the building materials to the construction site, then removed the materials from their packages. Orimpex paid $324,342.64 to repair or replace components of the first shipment, and $51,910.90 to repair or replace components of the second. Orimpex recovered $15,664 from its cargo insurer for the damage done to the rolls of insulation.

Pursuant to a contractual choice-of-forum clause, Orimpex and Servicios sued IMC under COGSA in federal court. Following a bench trial, the court found IMC liable for the damages to Orimpex's building materials.

The court calculated damages by first excluding the rolls of insulation, for which Orimpex had been compensated by its insurer. The court then computed the actual damages sustained for each shipment: $324,342.64 for the first shipment and $51,910.90 for the second.

The court then computed the maximum liability under COGSA, which establishes a maximum liability of $500 for each damaged package, 46 U.S.C. app. § 1304(5). In the first shipment, there were 287 non-insulation packages, for a maximum liability of $143,500 (287 × $500). In the second shipment, there were 249 non-insulation packages, for a maximum liability, for the half of the packages that had been damaged, of $62,250 (249 × .5 x $500). Given these maximums, the court set damages at $143,500 for the first shipment and $51,900 for the second, plus prejudgment interest.

COGSA provides a limitations period of one year from "delivery" during which a shipper must bring suit against the carrier:

> In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.

46 U.S.C. app. § 1303(6). This suit was filed more than a year from the ANDREALON's discharge and transfer of the cargo to the customs warehouse, but less than a year from when the consignee, Orimpex, received the goods after they cleared customs. Thus, when "delivery" occurred dictates whether the claims arising from the damage to the cargo of the ANDREALON are time-barred.

IMC urges that "delivery" means "delivery *from* the carrier," while Servicios contends that "delivery" means "delivery *to* the consignee." Between these two points in time are the ten days during which the cargo was in the possession of neither the carrier nor the consignee. The statute does not define the term, and either reading could be consistent with the plain text of the subsection.

A.

No court of appeals has decided when "delivery" occurs for

5

purposes of section 1303(6).[2]  Several district courts have addressed the question, however, and these cases can be arranged into two general lines of authority.  Some courts have concluded that "delivery" occurs when cargo leaves a ship's slings, irrespective of whether it is placed in the hands of the consignee (or its agent).  *See, e.g., Cargill Ferrous Int'l v. M/V ELIKON*, 857 F. Supp. 45, 47 (N.D. Ill. 1994); *C. Tennant Sons & Co. v. Norddeutscher Lloyd*, 220 F. Supp. 448, 449 (E.D. La. 1993).  Other courts have held that delivery occurs only when the consignee has a reasonable opportunity to inspect the goods for damage.  *See, e.g., Atlantic Mut. Ins. Cos. v. M/V BALSA 38*, 695 F. Supp. 165 (S.D.N.Y. 1988); *National Packaging Corp. v. Nippon Yusen Kaisha*, 354 F. Supp. 986, 987 (N.D. Cal. 1972).[3]  Finding neither standard entirely compelling, however, we adopt a different rule, one more closely in keeping with the nature of COGSA and with the general usage of the term "delivery" in maritime law.

B.

1.

Most limitation periods begin running when the cause of action "accrues."  *See, e.g.*, 45 U.S.C. § 56 (Jones Act).  Thus, under the Jones Act, which provides that actions are time-barred unless

---

[2] This issue was recognized but not decided in *Mendes Junior Int'l Co. v. M/V SOKAI MARU*, 43 F.3d 153, 155 n.2 (5th Cir. 1995).

[3] *See also* 2A MICHAEL F. STURLEY, BENEDICT ON ADMIRALTY § 163 (7th rev. ed. 1997) (describing different approaches); Michael F. Sturley, *An Overview of the Considerations Involved in Handling the Cargo Case*, 21 TUL. MAR. L.J. 263, 314-21 (1997) (same).

commenced "within three years from the day the cause of action *accrued*," *id*. (emphasis added), this circuit has applied the discovery rule with respect to latent injuries: "A cause of action under the Jones Act and general maritime law accrues when a plaintiff has had a reasonable opportunity to discover his injury, its cause, and the link between the two." *Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir. 1991). It is, of course, eminently reasonable that a cause of action should not "accrue" until the plaintiff has actual or constructive knowledge of its existence. *Cf. id.; Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228-29 (5th Cir. 1984).

The COGSA limitations period, however, makes no reference to when the cause "accrues." Rather, it defines the running of the limitations period solely by reference to an extrinsic event: when the goods were delivered. *See* 46 U.S.C. app. § 1303(6). This distinction is neither insignificant nor unique.[4] So, in enacting COGSA, Congress deliberately tied the limitations period to an extrinsic event and apparently paid no attention to when a cause might accrue or when a plaintiff has notice that it has been damaged.

Thus, the statute states that where the goods are lost at seaSSand are never deliveredSSthe period begins running not when the ship sinks, or when the consignee has notice of the loss, but,

___

[4] For example, the Louisiana limitations period for the avoidance of a sale of a defective good (redhibition) runs four years from the day of delivery, *or* one year from the day the defect was discovered, whichever occurs first. *See* LA. CIV. CODE ANN. ART. 2534 (West 1992).

7

instead, when the goods should have been delivered. *See* 46 U.S.C. app. § 1303(6). Any other eventSSincluding actual receipt by the consigneeSSis irrelevant to the mechanical application of when delivery should have occurred.

Similarly, when a shipment is first delayed and then arrives at port damaged, the limitations period commences not when the damaged goods are actually delivered, but rather when they *should have been* delivered. In *Western Gear Corp. v. States Marine Lines*, 362 F.2d 328 (9th Cir. 1966), the cargo washed overboard but was recovered and repaired and re-shipped, arriving five months after the original delivery date. The suit was time-barred, however, when it was brought less than a year after the *actual* delivery date but more than a year after the cargo *should have been* delivered.

Thus, the *Western Gear* court properly applied the limitations period without regard to when the consignee had notice that the goods were damaged, and even without regard to when the damaged goods were received by the consignee. The period began running when the cargo should have been delivered.

In this respect, the COGSA limitation period resembles a statute of repose:

> A statute of limitations extinguishes the right to prosecute an accrued cause of action after a period of time. It cuts off the remedy. It is remedial and procedural. A statute of repose limits the time during which a cause of action can arise and usually runs from an act of a defendant. It abolishes the cause of action after the passage of time even though the cause of action may not have yet accrued.

*Harding v. K.C. Wall Prods., Inc.*, 831 P.2d 958, 967 (Kan. 1992). It is apparent, then, that "delivery," and the commencement of the

8

one-year limitations period under § 1303(6), need not involve a reasonable opportunity to inspect.

2.

The text of and surrounding the one-year limitation clause also demonstrates that the operative events are defined by reference to the carrier's acts, not the ultimate consignee's. Notice of loss or damage must be given to the carrier "at the port of discharge before or at the time of removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage." § 1303(6). And "[i]f the loss or damage is not apparent, the notice must be given within three days of the delivery." *Id*. Read together, these clauses equate "delivery" with "removal into the custody of the person entitled to delivery thereof." Moreover, where the person entitled to delivery is a railroad or a customs house, not the consignee, there is "delivery" for purposes of the statute without regard to the actions of the consignee.

If, in § 1303(6), Congress had meant to begin the limitations period when the consignee received the goods, it could have accomplished this quite easily by using words to that effect. But instead of using the word "receipt," Congress used the word "delivery." Both the common and the legal meanings of these words make apparent that "delivery" is defined by acts of the carrier, not by "receipt."

Thus, commonly, to "receive" is "to *take* possession or delivery of," WEBSTER'S THIRD NEW INT'L DICTIONARY 1894 (1986) (emphasis added), but to "deliver" is to "*give*, transfer, yield possession or control of, make or hand over," *id*. at 597 (emphasis added). And

10

legally, to "receive" is to "*take* into possession and control; accept custody of; collect," BLACK'S LAW DICTIONARY 1268 (6th ed. 1990) (emphasis added), while "delivery" is "[t]he act by which the res or substance thereof is *placed* within the actual or constructive possession or control of another," *id*. at 428 (emphasis added).[5] Consequently, "delivery" entails acts by the carrier, and what acts will constitute proper delivery from the carrier is determined by the carriage contract and general maritime law.

C.

That "delivery" is thus defined to grant certainty to the carrier is also supported by the policy underlying the limitations period. The dual purposes of a limitations period are to force parties to litigate claims while the evidence is still fresh, and to grant the prospective defendant relative security and stability by allowing it better to estimate its outstanding legal obligations. *See, e.g.*, 50 TEX. JUR. 3D, *Limitation of Actions* § 2, at 266-68 (1986). Limitations periods

> represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free from stale claims in time comes to prevail over the right to prosecute them. . . . [T]hey protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

---

[5] Delivery need not include transfer of actual possession to the acquiror. Thus, "delivery" includes mailing. BLACK'S LAW DICTIONARY 1268 (6th ed. 1990).

11

*United States v. Kubrick*, 444 U.S. 111, 117-18 (1979); *see also Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 267 (5th Cir. 1991). Thus, the underlying policies of certainty and repose work strongly in favor of the notion that the defendant's conduct, and not some amorphous standard of "accrual" or the uncertain and uncontrollable "receipt by consignee and opportunity to inspect," should define when the statutory period begins to run.[6]

The policy that favors quickly ridding defendants of outstanding claimsSSthrough litigation or forfeitureSSis especially strong in the maritime context. The inverse-order rule of maritime liensSSthat the last lien to attach takes priority over all othersSSfavors those who act immediately on their claims. *See* GRANT GILMORE AND CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 9-62 (1975). Similarly, the admiralty proceduresSSwith the attachment of maritime liens and *in rem* actionsSSshow that the law recognizes the transient nature of ocean shipping and requires plaintiffs to act quickly upon their claims. This is because "the vessel must get on." *The St. Jago de Cuba*, 22 U.S. (9 Wheat.) 409, 416 (1824).

---

[6] The goal of certainty is, of course, sacrificed wherever the discovery rule is applied. There, the interest in granting relief to injured plaintiffs is adjudged to outweigh the defendant's interest in repose. But the discovery rule is by no means universally applied. Texas courts, for example, apply the discovery rule as "a very limited exception to statutes of limitation," and only "in those cases where the nature of the injury is inherently undiscoverable and the evidence of injury is objectively verifiable." *Computer Associates Int'l v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1994).

In cases of cargo loss or damage, there is, of course, nothing "inherently undiscoverable" about the injury. Unlike personal injuries with long latency periods, this damage was immediately apparent. *Cf. Crishman*, 932 F.2d at 415 ("If some injury is discernible when the tortious act occurs, the time of the event rule [rather than the discovery rule] respecting statute of limitations applies").

D.

Our interpretation of "delivery" for purposes of COGSA § 3(6) is consistent with the historical background of the statute. COGSA is our domestic enactment of the Hague Rules, a multinational convention that established uniform rules to govern ocean bills of lading. Those rules were approved by the Brussels Convention in 1922, some fourteen years before COGSA made them the law of the United States.[7] As its purpose was to establish international uniformity, COGSA could not substantively deviate from the Hague Rules. There was no real dickering over the terms, no process of drafting and revision. The history of Congress's enactment of the COGSA therefore sheds fairly little light on its intent.

Subject to this and to a more general objection to the use of legislative history in judicial interpretation of statutes,[8] we have perused most of the relevant historical documents and ultimately find them inconclusive on what was meant by "delivery" in § 1303(6). The only academic commentator squarely to address this issue similarly concluded that "there is evidence in the congressional hearings that seems to support both sides of the

---

[7] *See generally* Michael F. Sturley, *The History of COGSA and the Hague Rules*, 22 J. MAR. L. & COM. 1 (1991); 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 10-15 (2d ed. 1994).

[8] *See, e.g.*, ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 29-37 (1997). "My view that the objective indication of the words, rather than the intent of the legislature, is what constitutes the law leads me, of course, to the conclusion that legislative history should not be used as an authoritative indication of the statute's meaning." *Id.* at 29-30. Further, the use of legislative history "does not even make sense for those who accept legislative intent as the criterion. It is much more likely to produce a false or contrived result than a genuine one." *Id.* at 31-32.

debate."[9]  That is to say, nowhere in the bill's history does there appear to have been an explicit consensus that "delivery" occurred either when the carrier gave up control of the goods, or when the consignee received them.  Still, there is strong evidence to support the position we articulate today.


1.

Of initial import is the background upon which § 3(6) was written.  At the time when COGSA and the Hague Rules were drafted, bills of lading generally contained highly restrictive time-for-suit provisions, often requiring a consignee to sue the carrier within ninety days or forfeit its cause of action.[10]  Admiralty courts had upheld these clauses on freedom-of-contract principles, except in certain cases in which they would have eliminated the cause of action entirely.[11]  Because COGSA replaced these clauses with the uniform notice and time-for-suit provisions of § 1303(6),[12]

---

[9] James R. Ward, *The Floundering of "Delivery" Under Section 3(6) of COGSA: A Proposal To Steady Its Meaning in Light of Its Legislative History*, 24 J. MARITIME L. AND COMM. 287, 324 (1993) (hereinafter "Ward, *Floundering*").

[10] *See Relating to the Carriage of Goods by Sea: Hearings before the House Comm. on Merchant Marine & Fisheries on H.R. 3830*, 71st Cong. 2d Sess. 38 (1930), *reprinted in* 3 MICHAEL F. STURLEY, ED., THE LEGISLATIVE HISTORY OF THE CARRIAGE OF GOODS BY SEA ACT AND THE *TRAVAUX PREPARATOIRES* OF THE HAGUE RULES 365, 404 (1990).

[11] *See* HENRY N. LONGLEY, COMMON CARRIAGE OF CARGO § 16.03, at 201 & nn.15-16 (1967). *See also, e.g., United States Shipping Board v. Texas Star Flour Mills*, 12 F.2d 9, 11 (5th Cir. 1926) (holding clause precluding suit after six months from delivery to carrier unenforceable where shipmentSSand damageSStook longer than six months).

[12] Still, the drafters recognized that the Hague Rules and COGSA were contractual defaults, and thus that the time-for-suit provision was of the nature of a contract term.  *See* II INTERNATIONAL LAW ASS'N, REPORT OF THE THIRTIETH CONFERENCE: PROCEEDINGS OF THE MARITIME LAW COMMITTEE 113 (1922), *reprinted in* I STURLEY, LEGISLATIVE HISTORY 219 (opining that "it is a contract by the shipper that he will not sue

14

the courts' interpretation of those clauses could indicate how that subsection ought to be interpreted.[13]

This court's decision in *A. Russo & Co. v. United States*, 40 F.2d 39 (5th Cir. 1930), presents a nearly precise analog to COGSA's use of delivery to trigger the limitations period. In 1927, A. Russo & Co. shipped 1,000 cases of canned tomatoes from Palermo, Italy, to Chicago. The through bill of lading specified that an ocean carrier would take the cargo to New Orleans and deliver it to a railroad, which then would take the goods to Chicago. The bill of lading contained the following clause: "Claims for loss, damage, or injury to property must be made in writing to the originating or delivering carrier or carriers issuing this bill *within six months after delivery* of the property." *Id*. at 41 (emphasis added).

Delivery from the ship to the railroad at New Orleans was completed November 11, 1927; the goods were delivered to the consignee in Chicago on November 21. The consignee made a claim for damage to the agent of the ship on May 17, 1928, and filed a libel in admiralty on December 14, 1928. *Id*.

The question was whether the consignee's claim against the ocean carrier was time-barred. The May 17 claim was made more than

after twelve months").

[13] Many of the cases in which contractual time-for-suit provisions were litigated generally present no direct analog to the "delivery" standard of § 3(6). These clauses often related the time-for-suit period not to "delivery", but to the time goods were discharged or removed from the wharf. *See, e.g., THE PRESIDENT POLK v. THE PRESIDENT ADAMS*, 43 F.2d 695 (2d Cir. 1930); *Ikuno v. Morris & Co.*, 22 F.2d 140 (4th Cir. 1927); *Green Star S.S. Co. v. Nanyang Bros. Tobacco Co.*, 3 F.2d 369 (9th Cir. 1925).

six months after the ocean carrier's delivery to the railroad, but fewer than six months after the consignee received the goods in Chicago. *Id*. The court concluded that the claim against the carrier was barred, as it was brought over six months after the carrier's delivery to the railroad. *Id*.

It is thus apparent from *Russo* that "delivery" occurred when the ocean carrier had fulfilled its obligations under the bill of lading by placing the cargo into the hands of the railroad. That the consignee received the goods ten days later, and that the consignee could not determine the exact nature and amount of damage to the goods until such time, was immaterial. Delivery was not defined by receipt by the consignee, but rather occurred when the carrier had properly surrendered the goods in accordance with its contractual duties.

To the extent that COGSA's limitation period is essentially a contractual default, now incorporated by reference in all bills of lading, this common law gloss still obtains. Furthermore, there is support for this interpretation in the debates and statements made contemporaneously with the passage of COGSA.

2.

During Congressional hearings on COGSA, the question of "delivery" received some direct consideration.[14] The provision directly at issue was another clause of § 1303(6) that requires that, "[i]f the loss or damage is not apparent, the notice [to the

---

[14] *See generally*, Ward, *Floundering*, at 305-25.

16

carrier] must be given within three days of the delivery." 46 U.S.C. app. § 1303(6). The effect of giving notice in this way is to establish, *prima facie*, that the damage occurred during shipment. The same ambiguity presents itself: Was this delivery *from* the carrier or *to* the consignee?

The committee addressed the problem of the hypothetical inland consignee: where goods are delivered by ocean carrier to New York, then shipped by rail to Kansas City. One committee member pointed out that in such a case, the consignee does not know of the damage and cannot avail himself of the three-day-notice burden-shifting provision, unless the three days begins when the consignee receives the goods. To effect this, he recognized, "it would be necessary to say 'within three days after the *receipt* thereof by the ultimate consignee.'"[15]

The response, in essence, was that the language was deliberate: For policy reasons, it makes sense that "[t]he man at the port has to examine his goods within three days of *the time the ship lands the goods*."[16] And again: "Should not it be three days after the receipt of the goods by the person entitled to them?" The answer was unequivocal: "No, sir."[17] So, consistently with the principles of *Russo*, the committee seemed to agree that under COGSA, "delivery" was accomplished by relinquishing the goods to

---

[15] *Relating to the Carriage of Goods by Sea: Hearings Before the House Committee on Merchant Marine & Fisheries*, 67th Cong., 4th Sess. 74-78 (1923) (statement of Mr. Davis), *quoted in* Ward, *Floundering*, at 317-20.

[16] *Id*. (statement of Mr. Campbell).

[17] *Id*. (question by Mr. Brand, answer by Mr. Haight).

the land carrier, who is not necessarily the ultimate consignee.

The Congressional hearings also addressed the question of customs-house delivery.  Again, the issue was discussed in context of § 3(6)'s three day notice-of-loss clause.  There, however, the issue became muddled, as the committee members and those testifying seemed to confuse the issues of substantive liability for damage with the question of "delivery" that triggers the notice-of-claim period.[18]  As an academic said, it is "ultimately inconclusive."[19] But the issue of what constitutes "delivery" was left unaddressed, largely because the term carried an independent meaning at law: Said one drafter of the Hague Rules, "the shipowner must make a real delivery, but *what that delivery is to be it will be for the law of the land, the law of the port of destination to say.*"[20]

---

[18] *See* Ward, *Floundering*, at 320-25.

[19] *Id.* at 321.

[20] COMITÉ MARITIME INTERNATIONAL, *1922 LONDON CONFERENCE* 467 (1922), *quoted in* Ward, *Floundering*, at 321 (emphasis added).

E.

Thus, the text of COGSA and its underlying policies and history require that "delivery" be afforded its general legal meaning: the point at which the carrier has fulfilled its responsibilities to carry, discharge, and otherwise perform its contractual duties with respect to the cargo. "Delivery" occurs when the carrier places the cargo into the custody of whomever is legally entitled to receive it from the carrier.

The final question, therefore, is when, as a matter of contract and maritime law, delivery occurred. The case of *Tapco Nigeria v. M/V WESTWIND*, 702 F.2d 1252 (5th Cir. 1983), led to an oft-cited articulation of the delivery standard under COGSA and the Harter Act:

> Although the Harter Act was partially superseded by passage of the Carriage of Goods by Sea Act, COGSA defines the duty of care only from the time the goods are loaded on to the ship until the time when the cargo is released from the ship's tackle at port. 46 U.S.C. § 1301(e). Consequently, the Harter Act is still applicable to any period between the discharge of the cargo from the vessel and its proper delivery. . . . The Act itself does not define "proper delivery", but only prevents the carrier from agreements which would relieve it from liability for loss arising from negligence, including improper loading or delivery. 42 U.S.C. §§ 190, 191. General maritime law requires that a carrier "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it."

702 F.2d at 1255 (citations omitted) (quoting *F.J. Walker, Ltd. v. M/V LEMONCORE*, 591 F.2d 1138, 1142 (5th Cir. 1977)). This general duty of delivery, however, is subject to the "custom of the port

19

doctrine," which is

> the well-settled rule announced in *Tan-Hi v. United States*, 94 F. Supp. 432, 435 (N.D. Cal. 1950) that the common law requirements of proper delivery are modified by the custom, regulations, or law of the port of destination. As explained by that court, the duties to discharge cargo to a fit wharf, to separate each segment, and to protect the cargo until the consignee has a reasonable opportunity to remove it from the wharf, were elements of a proper delivery "only where the custom, regulations, or law of the port did not otherwise provide. . . . The common-law did not permit less nor require more in the way of delivery than the usage or the law of the port dictated."

*Id*. at 1255-26.[21]

This circuit has applied the custom of the port doctrine to determine who is entitled to receive cargo from the carrier. Thus, in *Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166 (5th Cir. Unit B May 1981), we directly held that delivery to customs authorities constitutes proper delivery where the custom or law of the port requires such: "[A] carrier's delivery to persons charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee is a good delivery on the part of the carrier." *Id.* at 168-69 (quoting *Tan Hi*, 94 F. Supp. at 435).[22]

---

[21] *See also* Judith Anne Meyer, Note, *In Another Country: The Effect of Mandatory Port Law upon Statutory Duties of Discharge and Delivery*§§Tapco Nigeria v. M/V Westwind, 9 MAR. LAW. 123, 135-36 (1984) ("[T]he correct focus for determining proper delivery is the person charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee. More precisely, proper delivery occurs at the point at which port law or usage dictates that the duties of such person shall commence.").

[22] It makes no difference that in *Imparca*, the bill of lading specified this point of delivery. The *Tapco Nigeria* court noted:

> In *Imparca*, the bill of lading provided that the responsibility of the carrier ended "when taken into the custody of customs or other authorities" of a foreign port. The fact that there was no similar provision here makes no difference. Because the Harter Act forbids the inclusion of any term in a bill of lading which would lessen or avoid the carrier's obligation to make a proper delivery, this

Thus, while contract and maritime law generally will dictate into whose custody an ocean carrier is required to deliver cargo, such law will be overridden by the established law or custom of the port of delivery.

In this case, it appears that the custom and laws of the port of La Guaria require ocean carriers to deliver cargo to an authorized customs warehouse pending clearance.[23] IMC accordingly delivered the cargo of the ANDREALON to Mercaduana, completing such delivery on May 2, 1992. Once IMC had properly placed its cargo in the hands of the party authorized to receive it, IMC had "delivered" the cargo, and the one-year time-for-suit period began to run. Because Servicios and Orimpex filed suit more than a year after this "delivery," the claims for damage from that shipment are barred under 46 U.S.C. app. § 1303(6).

Although this result seems, facially, somewhat harsh, it is fair. Limitation periods exist solely for the benefit of defendants and always will produce harsh results when they operate to bar a claim that is otherwise valid.

Servicios and Orimpex had ample opportunity to file suit well before the period expired. They knew of the damage almost immediately upon discharge. The district court found, as a matter

---

provision could not effect liability before delivery had been accomplished. Our decision in *Imparca* is implicit recognition that proper delivery was achieved when the INP took custody of the containers during the unloading process.

702 F.2d at 1257 n.2.

[23] In fact, this delivery occurred not at the warehouse but under the ship's slings, when Mercaduana took possession of the cargo.

21

of fact, that the damage was visible when the cargo was off-loaded from the ANDREALON. Servicios hired a surveyor who examined and documented the damage as the cargo was unloaded and stored in the Mercaduana customs warehouse. The record contains photographs showing visible and obvious damage to the cargo as it sits on the wharf under the ship's slings.

In sum, Servicios and Orimpex had a year to file suit but neglected to do so. It is fair that the claims should be time-barred.[24]

III.

COGSA provides that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to . . . goods in an amount exceeding $500 per package . . . ." 46 U.S.C. app. § 1304(5).[25] Servicios and Orimpex did not keep the contents of the various packages separate after delivery but opened them all, and only after their contents were commingled did they assess the aggregate damage. The district court thus heard no evidence of the damage done to each package, or whether the damage to any package met or exceeded the $500 limitation. Therefore, the court aggregated the $500 limit for all of the damaged packages, and

---

[24] If we were presented with a different circumstanceSSif, for example, the goods had remained in the customs warehouse for over a yearSSit might be possible to engage in equitable tolling of the limitations period. *Cf., e.g., Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 267-68 (5th Cir. 1991). We have no occasion, in this case, to speculate as to when, in fact, such tolling would be appropriate; we state only that we do not foreclose its possibility in other contexts.

[25] Parties can contract around this default limitation, but that did not occur here. *See* 46 U.S.C. app. § 1304(5).

against this total limit applied the total damages sustained. This was error.

## A.

Because neither party attempted to show the damage sustained to each package, we are presented with the novel question of who has the burden of doing so. The more typical case involves uniform cargo that is uniformly damaged. *See, e.g. Croft & Scully Co. v. M/V SKULPTOR VUCHETICH*, 664 F.2d 1277 (5th Cir. 1982) (1,755 cases of soda crushed). Or if the case involves non-uniform cargo or damage, the court generally will be able to determine the quantum of damage to each package. *See, e.g., Universal Leaf Tobacco Co. v. Companhia de Navegacao Maritima Netumar*, 993 F.2d 414, 416 (4th Cir. 1993) (cases of various tobacco products in various states of damage enumerated by court).[26]

Here, on the other hand, we have very different packages damaged, respectively, to a very different extent: from bundles of steel that were bent in various degrees, to rolls of insulation that were torn in various ways. But we have no attempt by the consignee to quantify the per-package damages. Although Orimpex hired a surveyor immediately after the cargo had been discharged from the ANDREALON, it apparently made no attempt to discern the quantum of damage to each package. By the time IMC's surveyor arrived, much or all of the cargo already had been removed from its

---

[26] In that case, the buyer of the goods apparently considered it its duty to hire a surveyor and ascertain the precise amount of damage to each package.

23

original packaging and commingled.

### B.

Servicios argues that a limitation on liability is an affirmative defense and that the carrier that seeks its protection must show its applicability. Thus, Servicios contends that the burden fell on IMC to show the damage sustained to each package.

### 1.

There is no question that IMC had the burden of establishing the availability of the $500 limitation: "[T]he burden rests upon the carrier of goods by sea to bring himself within any exception relieving him from the liability which the law otherwise imposes on him." *Schnell v. THE VALLESCURA*, 293 U.S. 296, 303 (1934).[27] But this rule deals only with the availability of the limitation, not with the quantum of damages recoverable. *Cf., e.g, Schnell*, 293 U.S. at 303-05.

Neither side disputes that the $500 limit is applicable. IMC's burden of showing its availability is therefore discharged. But the effect of the per-package limitation, once its applicability is established, is that it becomes part of the substantive law of damages that the plaintiff then has the burden

---

[27] *See also Craddock Int'l v. W.K.P. Wilson & Son*, 116 F.3d 1095, 1105-06 (5th Cir. 1997). And more specifically, a number of courts have explicitly or implicitly treated § 1304(5) as an affirmative defense, the availability of which must be established by the carrier. *See, e.g., Rockwell Int'l Corp. v. M/V INCOTRANS SPIRIT*, 998 F.2d 316 (5th Cir. 1993); *Couthino, Caro & Co. v. M/V SAVA*, 849 F.2d 166 (5th Cir. 1988); *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897 (9th Cir. 1989); *Binladen BSB Landscaping v. M/V NEDLLOYD ROTTERDAM*, 759 F.2d 1006, 1009 (2d Cir. 1985).

of proving.

2.

It is a basic concept of damages that they must be proved by the party seeking them. *See, e.g., Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 652 (5th Cir. 1994); *Pizani v. M/V COTTON BLOSSOM*, 669 F.2d 1084, 1088 (5th Cir. 1982). And where the damages that are legally recoverable are less than the total amount sustained, the injured party cannot simply show the total amount, but must prove that portion to which it is legally entitled. In *Pizani*, we refused to allow the plaintiff to present a damage figure where he had failed to segregate what was recoverable from what was not. We stated:

> [W]here a plaintiff has shown the gross amount of expense or loss, but where defendant is not liable (by substantive law) for all of the loss . . . courts are strict in requiring plaintiff to prove affirmatively the amount that should be subtracted, before he can recover anything on account of the loss or expense in question.

669 F.2d at 1089 (quoting 2 F. HARPER & F. JAMES, THE LAW OF TORTS § 25.3, at 1305 (1956)).[28]

The substantive law of damages includes the $500 per-package limitation. As always, it was the plaintiff's burden to show its compensable damages. It is not enough, then, that Servicios proved the gross amount of its damages, where it is not entitled to

---

[28] *Accord United States ex rel. Gray-bar Elec. Co. v. J.H. Copeland & Sons Constr., Inc.*, 568 F.2d 1159, 1161-62 (5th Cir. 1978) (holding that the party seeking damages must show the specific amount it is entitled to recover, not just the total amount of damages).

recover that entire amount. Servicios must show how much damage accrued to each package, and it will be awarded the actual damages to each package, subject to the $500 limit.[29]

3.

As a matter of policy, it is appropriate to place the burden of showing per-package damages on the buyer. It will always be difficult for the carrier to show the damages that accrued to each cargo package. Only the buyer knows how much each package is worth to it, and what will be the cost to repair or replace the damaged goods. And because the buyer and not the carrier is entitled to possession of the goods, it will always be more difficult for the carrier to inspect the damage. Furthermore, there is every incentive for the buyer to do as Servicios and Orimpex did here: commingle the damaged goods so that the carrier could not have made a per-package damage determination even if it had tried to do so.[30]

There is no question that, if possible, a buyer would avoid any per-package damage computation, thereby gaining the damage cap amount from all the slightly-damaged, inexpensive packages, and using that to offset the damages to the heavily-damaged, more valuable packages.[31] The buyer would always be at least as well or

---

[29] One example of a proper per-package damage breakdown appears in *Universal Leaf Tobacco*, 993 F.2d at 416.

[30] We do not, of course, suggest any bad faith here. Rather, we simply note the alignment of legal incentives.

[31] Suppose, for example, that there are 100 packages worth $1,000 each; 20 are ruined in transit. Under an aggregate damage cap (100 packages × $500 = $50,000), the buyer recovers the full $20,000, as it is less than the total cap

better off under an aggregate damage cap than under a strict per-package limit.  This would thwart the basic COGSA scheme, which deliberately limits damages not by the shipload but by the package.

## C.

By its strict application, this rule would require outright dismissal of Servicios' claims, for where the plaintiff has failed, at trial, to prove an essential element of its cause of action, including both the fact and amount of his damages, that is fatal, and it cannot prevail as a matter of law.  *See Prunty*, 16 F.3d at 652.  The peculiar circumstances of this case, however, lead us to remand in order to give Servicios an opportunity to show its per-package damages.  There was not a total failure of proof.  Rather, Servicios mistakenly assumed that, as a matter of law, it was required to prove only the total quantum of damages.  More importantly, this belief was shared by the district court, and the bench trial apparently was conducted on this theory.  Servicios therefore never had a true opportunity to show the damages to which it may be entitled.  Cognizant of the equitable role of a court sitting in admiralty,[32] we remand for a proper determination of damages.

---

of $50,000.  Under a strict per-package damage cap, it recovers only $10,000: $500 each for the 20 ruined packages.

Or suppose 100 packages, 80 worth $100 and 20 worth $2,000.  They are all damaged and lose half their value.  An aggregate damage cap gives the buyer $24,00 ($4,000 (80 × $50) plus $20,000 (20 × $1,000)), while a strict per-package damage cap yields only $14,000.

[32] *See, e.g., Pizani*, 669 F.2d at 1089; *Compania Anonima Venezolana de Navagacion v. A.J. Perez Export Co.*, 303 F.2d 692, 699 (5th Cir. 1962)

IV.

In sum, then, because IMC completed delivery of the ANDREALON's cargo to the party entitled to receive it on May 2, 1992, the claims with respect to that cargo in the action commenced on May 11, 1993, are barred by COGSA's time-for-suit provision, 46 U.S.C. app. § 1303(6). The district court erred by allowing Servicios to recover an aggregate amount of damages without regard to the actual damages to each package, where damages legally recoverable were capped at $500 per package. We therefore REVERSE and REMAND for a proper determination of damages as to those claims that are not time-barred.