# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 98-20877

_____

MANNESMAN DEMAG CORPORATION,

                                Plaintiff-Appellant-
                                Appellee,

                VERSUS

M/V CONCERT EXPRESS, ETC., ET AL.,

                                Defendants.


ATLANTIC CONTAINER LINE, INC.,

                                Defendant-
                                Third Party Plaintiff-
                                Appellee,

                VERSUS

TRISM SPECIALIZED CARRIERS, INC.,

                                Third Party Defendant-
                                Appellee-
                                Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

September 8, 2000

Before SMITH and DENNIS, Circuit
   Judges, and HARMON, District Judge.[*]

JERRY E. SMITH, Circuit Judge:

Mannesman Demag Corporation ("Mannesman") appeals the amount of a summary judgment award in its favor, and Trism Specialized Carriers, Inc. ("Trism"), appeals an adverse summary judgment in favor of Atlantic Container Line, Inc. ("Atlantic"). We reverse and remand.

## I.

This case arises from damage sustained to an oxygen compressor and instrument rack owned by Mannesman, which were transported from Bremerhaven, Germany, to Terre Haute, Indiana. Atlantic carried the goods from Bremerhaven to the Port of Baltimore, Maryland, aboard the M/V CONCERT EXPRESS. Trism carried the goods from Baltimore to Terre Haute. While en route from Baltimore to Terre Haute, the goods were damaged when Trism's trailer overturned.[1]

There was only one bill of lading for the entire transportation, issued by Atlantic, reflecting an agreement to transport the goods from Bremerhaven, Germany, to the midwestern United States.[2] The bill is what is called a "through bill of lading."[3] Because the bill obligated the carrier to transport the cargo "through" the port to its ultimate destination, it is referred to as a "through bill." When the goods arrived at the Port of Baltimore, Atlantic hired Trism to transport them to Terre Haute.

## A.

This case presents an issue of first impression regarding the applicability of federal maritime statutes to inland transport under a through bill of lading. The following excerpt describes the origin of this issue.

Until the advent of the containerization of cargo, the cargo owner typically would enter into a new shipment contract with a new carrier each time the mode of transport changed. An inland carrierSSa railroad, trucker or, in some cases, an inland barge operatorSSwould carry the goods to a seaport under one contract of carriage. There someone, usually a "freight forwarder" acting on behalf of the cargo owner, would arrange to place the goods in the hands of a steamship line. Frequently it would be necessary to repack the goods for ocean shipment. The ocean carrier

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[1] Mannesman claims that the reasonable and necessary costs of repair amount to over $145,000.

[2] Apparently, the original agreement had a final destination of Chicago, Illinois, but the parties agreed to final delivery in Terre Haute, Indiana.

[3] "A through bill of lading is one by which an ocean carrier agrees to transport goods to their final destination. Someone else (e.g. railroad, trucker, or air carrier) performs a portion of the contracted carriage." Charles S. Donovan & Jill M. Haley, *Who Done It and Who's Gonna Pay?*SS*Rights of Shippers and Consignees Against Non-Ocean Carriers Performing Part of a Contract of Carriage Covered by a Through Bill of Lading*, 7 J. INT'L L. & PRAC. 415, 416 (1998). *See Jagenberg, Inc. v. Georgia Ports Auth.*, 882 F. Supp. 1065, 1068 (S.D. Ga. 1995).

would transport them to a foreign seaport and release them there to the consignee or someone acting on the consignee's behalf.

Different legal regimes arose to govern the parties' rights and liabilities, depending upon the mode of shipment. . . . If the railroad did the damage, then the rules of liability governing railroads would apply. If the steamship line was liable, then maritime law would govern.

Along came intermodal shipping containers and everything changed. Now, the same steel cargo container can move freely between different modes of transport. Ocean carriers began to offer "door to door" service. Rail carriers, truckers or other transporters now contract, not with the owner of the goods, but as a subcontractor to the steamship line who has offered a complete transport package.

Under United States law, a shipper or consignee may recover against non-ocean carriers for the loss of or damage to cargo subject to a "through bill of lading." The bill of lading may, if properly drafted, limit both the amount an owner may seek as well as the time in which recovery may be sought.

\* \* \*

The U.S. Carriage of Goods by Sea Act (COGSA) governs the liability of an ocean carrier on an international through bill of lading. . . . COGSA contains important benefits to the carrier. Inland carriers frequently attempt to take advantage of the benefits afforded by COGSA. One of COGSA's most important provisions limits a carrier's liability to five hundred dollars ($500US) per package unless a higher value is declared by the shipper. COGSA also contains a one-year limitation for cargo claims.

\* \* \*

By its terms, COGSA applies "tackle-to-tackle" only; it does not extend to losses which occur prior to loading or subsequent to discharge from a vessel.[4] A Period of Responsibility clause can be used to extend COGSA's application to the entire time the goods are within the carrier's custody.

Charles S. Donovan & Jill M. Haley, *supra* note 3, at 415-17.

B.

The parties agree that the controlling contractual document is the single bill of lading issued by Atlantic, which provides:

3. CARRIER'S RESPONSIBILITY

(1) . . . If and to the extent that the provisions of the Harter Act . . . would otherwise be compulsorily applicable to regulate the Carrier's responsibility for the goods . . . the Carrier's responsibility shall instead be subject to COGSA, but where COGSA is found not to be applicable such responsibility shall be determined by the provisions of 3(2) below . . . .

\* \* \*

---

[4] The Harter Act applies after discharge but before "proper delivery." *See* part IV, *infra*.

3

(2) Save as is otherwise provided in this Bill of Lading, the Carrier shall be liable for loss of or damage to the goods occurring from the time that the goods are taken into his charge until the time of delivery to the extent set out below.

\* \* \*

(B) Where the stage of carriage where the loss or damage occurred can be proved.

\* \* \*

(ii) With respect to the transportation in the United States . . . from the Port of Discharge, the responsibility of the Carrier shall be to procure transportation by carriers (one or more) and such transportation shall be subject to the inland carrier's contracts of carriage and tariffs and any law compulsorily applicable. The Carrier guarantees the fulfillment of such inland carriers' obligations under their contracts and tariffs.

\* \* \*

6. PACKAGE/UNIT LIMITATION AND DECLARED VALUE

(1) Package or Unit Limitation

Where the Hague Rules or any legislation making such Rules compulsorily applicable (such as COGSA or COGWA) to this Bill of Lading apply, the Carrier shall not, unless a declared value has been noted . . . be or become liable for any loss or damage to or in connection with the goods in an amount per package or unit in excess of the package or unit limitation as laid down by such Rules or legislation. Such limitation amount according to . . . COGSA is US $500 . . . .

\* \* \*

7. TIME-BAR

. . . All liability whatsoever of the Carrier shall cease unless suit is brought within 12 months after delivery of the goods or the date when the goods should have been delivered.

C.

Before filing the instant matter, Mannesman sued Trism (the "previous lawsuit").[5] Trism argued that the suit was barred by the bill's one-year time-bar, while Mannesman contended that the suit was governed by limitations in Trism's contracts of carriage and tariffs. As a matter of contractual interpretation, the court held that the "TIME-BAR" provision of the Bill unambiguously applied to all aspects of the through bill, and therefore granted summary judgment in favor of Trism. Mannesman did not appeal.

Mannesman then filed the instant suit against Atlantic, which brought a third-party claim against Trism for contribution and indemnity. Mannesman moved for summary judgment against Atlantic, which filed a cross-motion for summary judgment against

_____

[5] Apparently to avoid being a party to the previous lawsuit, Atlantic signed an agreement with Mannesman extending the contractual limitations period.

4

Mannesman. The court granted summary judgment, without opinion, in favor of Mannesman against Atlantic in the amount of $1000 plus post-judgment interest, and in favor of Atlantic against Trism in the same amount, arriving at the $1000 figure via the bill's $500 per package limitation.

Mannesman appeals the amount of the award, and Trism cross-appeals, contesting liability. Atlantic does not appeal and thus does not contest the finding of liability.

## II.

Atlantic contends that Mannesman is attempting to relitigate issues that were necessarily decided in the previous lawsuit and is barred from doing so by the doctrine of collateral estoppel. Although Mannesman does not so argue, it appears that neither Atlantic nor Trism raised collateral estoppel in the district court, in which case we will not apply the doctrine on appeal. *See American Cas. Co. v. United S. Bank*, 950 F.2d 250, 253 (5th Cir. 1992).

It is, however, unnecessary to resolve waiver, because Atlantic's contention of collateral estoppel is without meritSSthe issue is not identical to that litigated in the previous lawsuit.[6] In that suit, the court merely had to decide that the express one-year limitations bar was applicable to all aspects of the through bill of lading. That limitation is not relevant here, because Atlantic has contractually agreed to extend that period. Instead, we must decide which of the two contractual limitations of liability is applicable, which requires in-

---

[6] *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998) (stating the four required collateral estoppel factors), *cert. denied*, 526 U.S. 1034 (1999).

terpretation of, inter alia, the Harter Act.

The district court's opinion in the previous lawsuit recognizes this distinction (emphasis in original):

Section 3 of the [Atlantic] Bill of Lading, entitled "Carrier's Responsibility," addresses the Carrier's liability, and section 3(2) states the different measures of liability depending upon where the loss or damage to the goods occurred . . . . Specifically, section 3(2)(B)(ii) sets forth the measure of liability for inland carriage of goods in the United States or Canada. For inland carriage of goods, liability is to be measured by reference to the inland carrier's contracts of carriage and tariffs and any law compulsorily applicable. There is no mention in section 3(2)(B)(ii), or in the entirety of section 3 for that matter, of a specific limitations period for the bringing of suit for recovery of the damage or loss of goods during the inland portion of the carriage. Section 7, however, of the governing [Atlantic] Bill of Lading is specifically entitled, "Time Bar," and sets forth an all-inclusive time bar provision . . . . Mannesman has not directed the Court to any case law, and the Court can find none, that would read a conflicting limitations period into the liability provision contained in section 3(2)(B)(ii) in the face of, and contrary to, a separate section of the Bill of Lading that sets forth a specific and all inclusive time bar proviso.

Atlantic argues that, to determine when the limitations period began running, the previous lawsuit necessarily resolved when and where

delivery occurred. That determination, however, is not equivalent to determining when delivery occurred under the Harter Act. Because the bill's liability limitation is explicitly partitioned based on the limits of Harter Act compulsory applicability, interpretation of the Harter Act remains for us in this appeal.

## III.

Atlantic contends that Mannesman waived argument regarding the Harter Act by failing to raise the issue in the district court. Mannesman moved for summary judgment, arguing that the inland carrier's tariff, not the COGSA $500 per package limitation, provided the applicable limitation of liability. Atlantic cross-moved for summary judgment, arguing that the limitation is the COGSA $500 per package amount and specifically averring that the Harter Act is compulsory applicabile.

By granting Atlantic's cross-motion as to amount of liability, the court necessarily determined that the Harter Act was compulsorily applicable to the inland portion of carriage. This issue was therefore raised and considered by the district court and is properly before us.[7]

## IV.

We must determine, as a matter of first impression, whether the Harter Act is compulsorily applicable to the inland portion of carriage pursuant to a through bill of lading. We have decided a number of cases interpreting similar bills of lading and their reference to the Harter Act, but in none of

those cases had the goods begun inland transport.[8]

Atlantic's bill references two statutes, the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300-1315, and the Harter Act, 46 U.S.C. app. §§ 190-196. Under COGSA, a carrier of goods in international commerce must "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. app. § 1303(2). The Harter Act imposes a duty of "proper loading, stowage, custody, care, [and] proper delivery." 46 U.S.C. app. § 190. Although the Harter Act's applicability to international commerce was partially superseded by COGSA,[9] COGSA is applicable only from the time goods are loaded onto the ship until the time the cargo is released from the ship's tackle at port. *See* 46 U.S.C. app. § 1301(e); Tapco, 702 F.2d at 1255. Therefore, the Harter Act applies to the period between the discharge of the cargo from the vessel and "proper delivery." *See Tapco*, 702 F.2d at 1255.

Because the Harter Act does not define "proper delivery," courts have defined proper

---

[7] *See Gilley v. Protective Life Ins. Co.*, 17 F.3d 775, 781 (5th Cir. 1994) (rejecting the contention that an argument first raised in response to a motion for summary judgment is waived on appeal).

[8] *See, e.g.*, *Metropolitan Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58 (5th Cir. 1994) (damage from salvage sale when goods not picked up at wharf); *Tapco Nigeria, Ltd. v. M/V WESTWIND*, 702 F.2d 1252 (5th Cir. 1983) (damage during stevedoring); *F.J. Walker, Ltd. v. M/V LEMONCORE*, 561 F.2d 1138 (5th Cir. 1977) (damage during stevedoring and port delivery).

[9] COGSA is not applicable to contracts of carriage between ports of the United States and inland water carriage under bills of lading, and therefore such domestic transport is still governed by the Harter Act. *See* 8 BENEDICT ON ADMIRALTY § 21.03[1][a], at 21-7 through 21-8 (7th ed. 1998).

delivery as discharge of cargo "upon a fit and customary wharf." *Id.*[10] Proper delivery also includes the general maritime law requirement that a carrier "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *Tapco*, 702 F.2d at 1255.[11] These requirements of "proper delivery" are modified by "the custom, regulations, [and] law of the port." *Tapco*, 702 F.2d at 1255.[12] Thus, the critical question is "whether delivery was to persons charged by the law and the usage of the port with the duty to receive cargo and distribute it to the consignee." *Tapco*, 702 F.2d at 1257 (internal quotation marks omitted).

COGSA also refers to "delivery," which commences the running of a one-year limitations period. See 46 U.S.C. app. § 1303(6). In *Servicios-Expoarma, C.A. v. Industrial Maritime Carriers, Inc.*, 135 F.3d 984, 993 (5th Cir. 1998), we determined that when such "delivery" occurs varies according to the custom and laws of a port but that "delivery" is not equivalent to receipt by the consignee. Thus, when an ocean carrier transferred its cargo to an authorized customs warehouse in the Venezuelan port of destination, delivery was completed regardless of the fact that the consignee had not yet received the goods. *See id.*

Atlantic's bill of lading provides that, to the extent the Harter Act is compulsorily applicable, the Carrier's "responsibility shall . . . be subject to COGSA." ¶ 3(1). It further states that "[w]here . . . [COGSA] appl[ies], the Carrier shall not . . . be or become liable for any loss or damage . . . in an amount per package or unit in excess of . . . $500." ¶ 6(1). Therefore, if the Harter Act is compulsorily applicable to Trism's inland transport, the court correctly limited Atlantic's liability to $500 per package.

The same contractual provision extending COGSA to the limits of the Harter Act also states: "[B]ut where COGSA is found not to be applicable [the Carrier's] responsibility shall be determined by the provisions of 3(2) below." ¶ 3(1). Paragraph 3(2)(B)(ii) provides that, where the occurrence of damage can be proved to occur during transportation "in the United States," "the responsibility of the Carrier shall be to procure transportation by carriers (one or more) and such transportation shall be subject to the inland carrier's contracts of carriage and tariffs and any law compulsorily applicable. The Carrier guarantees the fulfillment of such inland carrier's obligations under their contracts and tariffs."

Mannesman argues that Harter Act "proper delivery" occurred when Trism acquired control over the goods and began inland transportation. If this is correct, then at the time the goods were damaged, the Harter Act was not compulsorily applicable, in which case the Bill provides that Atlantic's liability is governed by Trism's contracts and tariffs.[13]

---

[10] *See also Metropolitan*, 12 F.3d at 61; *F.J. Walker*, 561 F.2d at 1142, 1143-44.

[11] *See also Metropolitan*, 12 F.3d at 61; *F.J. Walker*, 561 F.2d at 1142.

[12] *See also F.J. Walker*, 561 F.2d at 1144.

[13] Mannesman contends that Trism's tariff limits its liability to $2.50 per pound, but apparently he

(continued...)

Atlantic counters that the through bill of lading provided for carriage from Germany to Terre Haute, inclusive, and therefore that Harter Act proper delivery had not yet occurred at the time the goods were damaged.

There is no precedent by any circuit court of appeals interpreting Harter Act proper delivery with respect to the inland portion of a through bill of lading. There is, however, a thorough and persuasive district court opinion, from another circuit, that has been followed by other district courts.

In *Jagenberg, Inc. v. Georgia Ports Auth.*, 882 F. Supp. 1065 (S.D. Ga. 1995), the court considered an Atlantic bill of lading apparently identical to the one here. The court first cited a traditional definition of "proper delivery" found in *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 741-42 (4th Cir. 1993) as

> either actual or constructive delivery. Actual delivery consists of completely transferring the possession and control of the goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody.

*Jagenberg*, 882 F. Supp. at 1076-77. The court then noted the complication raised by a through bill:

[T]he contract was intermodal, meaning that [Atlantic] contracted with Jagenberg to transport the goods over sea from The Netherlands, and then over land to . . . Macon, Georgia . . . . Macon was the place at which a consignee or its "agent" . . . first encountered the cargo. Consequently, the Court must either extend the reach of the Harter ActSSa maritime lawSSto the point of delivery in Macon, Georgia, or it must find some principled manner of deciding when a proper delivery occurred beforehand, despite the fact that, technically, no agent of Jagenberg had a reasonable opportunity to take the goods into "proper care and custody" before they reached Macon.

*Id.* at 1077.

Based on the maritime nature of the Harter Act, the court held that inland transportation under a through bill occurs after Harter Act proper delivery:

[T]he Harter Act is at its core a maritime law; the Court is unwilling to rule that simply because private parties enter an intermodal agreement federal maritime legislation is thus extended far beyond its congressionally intended bounds. The Harter Act is designed solely to regulate the liability of sea-going carriers. That said, the Court finds that the Harter Act does reach to the point at which goods are loaded onto the vehicles of an inland trucker, whether hired by the shipper or the carrier.

*Id.* at 1077-78 (internal citations omitted). Harter Act proper delivery, however, precedes

---

[13](...continued)
has produced no evidence in this regard.

8

that inland transport. *See id.* at 1077. The court concluded:

In this age of "containerized" cargoes subject to "multimodal" bills of lading, it is often difficult to locate precisely the points of legal delivery. Increasing efficiency and integration in cargo transport continues to blur the lines separating sea carrier responsibilities from those of others. The Court finds it advisable to keep sea carriers to the standards imposed by the Harter Act until goods are in the hands of land carriers and actually leaving the maritime arena. With COGSA covering carriers' legal responsibilities through discharge, Harter fills a potential gap between discharge and inland transit in those situations where goods, though on the dock, are still within the control and responsibility of the sea carrier.

*Id.* at 1078-79.[14]

*Jagenberg* was adopted in *Colgate Palmolive Co. v. M/V ATLANTIC CONVEYOR*, 1997 A.M.C. 1478, 1996 U.S. Dist. LEXIS 19247, at *14 (S.D.N.Y. Dec. 31, 1996), which again concerned an Atlantic through bill of lading: "Proper delivery occurs when the cargo is ready for inland transport."[15] The *Jagenberg* and *Colgate Palmolive* courts were not aware

of a single case extending the Harter Act to all stages of a through bill of lading. *See id.* at *15 n.3; *Jagenberg*, 882 F. Supp. at 1077 n.13. The parties in the case *sub judice* cite no contrary authority.[16]

We find these decisions persuasive and therefore conclude that the Harter Act was not compulsorily applicable at the time Mannesman's goods were damaged. This analysis not only avoids compulsory application of federal maritime law to non-maritime transportation, but has the benefit of not rendering superfluous the alternative liability provisions found at paragraph 3(2) of Atlantic's bill of lading.[17]

Our ruling is also consistent with *Servicios*'s interpretation of COGSA "delivery." As with COGSA, Congress could have, but chose not to, use "receipt" instead of "delivery." *See Servicios*, 135 F.3d at 989. Thus, Harter Act "delivery," like COGSA "delivery," is inter-

---

[14] The damage in *Jagenberg* occurred at port *before* loading onto inland-bound trucks, and therefore the court found proper delivery had not yet occurred. *See Jagenberg*, 882 F. Supp. at 1069, 1077.

[15] *See also Colgate Palmolive*, 1996 U.S. Dist. LEXIS 19247, at *15 ("Like the *Jagenberg* Court, I decline to hold that the Harter Act covers inland transportation of cargo.").

[16] *Jagenberg* has been adopted by other courts, as well. *See Abbott Chem., Inc. v. Molinos de Puerto Rico, Inc.*, 62 F. Supp. 2d 441, 448 (D.P.R. 1999) ("[T]he Harter Act is applicable to a carrier's liability pursuant to an intermodal contract . . . only to the extent that the obligations claimed to be violated are maritime."); *Standard Multiwall Bag Mfg. Co. v. Marine Terminals Corp.*, 961 F. Supp. 240, 242 (D. Or. 1996); *M.C. Machinery Sys., Inc. v. Maher Terminals, Inc.*, 164 N.J. 192, 212 (2000).

[17] *See Transitional Learning Community, Inc. v. United States Office of Personnel Management*, 2000 U.S. App. LEXIS 19008, at *10 (5th Cir. Aug. 9, 2000) ("[A] contract should be interpreted as to give meaning to all of its termsSSpresuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").

preted according to the "common law gloss" that "[d]elivery [is] not defined by receipt by the consignee, but rather occur[s] when the carrier ha[s] properly surrendered the goods in accordance with its contractual duties." *See id.* at 991. *Servicios* did not interpret "delivery" in the context of a through bill of lading but made clear that delivery is governed by general maritime law obligations as modified by specific contractual provisions, not by receipt of the goods. *See id.* at 992-93.

We do not preclude parties from contractually limiting liability during the entire time in which the carrier has custody or control over the cargo.[18] We merely hold that where parties contractually tie such limitation to the extent that the Harter Act is compulsorily applicable, the limitation does not apply to inland transportation in through bills of lading. A contrary result extends the compulsory applicability of the Harter Act to transportation that Congress almost certainly did not intend to include within that act.

For all of the foregoing reasons, Harter Act proper delivery preceded the damage at issue, so we vacate the awards in favor of Mannesman and Atlantic.[19] Because the record lacks evidence of, *inter alia*, the applicable tariff limitation and the extent of damage to the goods, we remand for further proceedings.

## V.

Mannesman moved for summary judgment against Atlantic, and Atlantic filed a cross-motion for summary judgment against Mannesman. Although neither party moved for summary judgment against Trism, the court nevertheless granted judgment in favor of Atlantic against Trism.

This was error. A court may grant summary judgment sua sponte but must provide adequate notice and an opportunity to respond akin to that required by FED. R. CIV. P. 56(c). *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 28 F.3d 1388, 1397-98 (5th Cir. 1994). If the court fails to provide such notice, we will reverse the grant unless the error is harmless. See *id.* at 1398.

There is harm here, because Trism has a potentially valid defense that it was not on notice to raise. Atlantic claims the right unilaterally to create liability on the part of Trism by agreeing to extend the existing contractual limitations bar. Trism is entitled to an opportunity to refute this contention, and we therefore reverse the judgment of liability against Trism.

REVERSED and REMANDED.

---

[18] *See, e.g.*, *Jagenberg*, 882 F. Supp. at 1070 n.1 (citing *Brown & Root, Inc. v. M/V PEISAN-DER*, 648 F.2d 415, 420 (5th Cir. June 1981)).

[19] We therefore do not reach Mannesman's claim that the court erred by failing to award pre-judgment interest.